W.L.F. v G.T.F. (2026 NY Slip Op 50310(U))

[*1]

W.L.F. v G.T.F.

2026 NY Slip Op 50310(U)

Decided on March 10, 2026

Supreme Court, Kings County

Sunshine, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 10, 2026
Supreme Court, Kings County

W.L.F., Plaintiff,

againstG.T.F., Defendant.

Index No. REDACTED

Green Kaminer Min & Rockmore LLPAttorney for PlaintiffBy: Nancy Green, Esq.The Graybar Building420 Lexington Avenue, Suite 2821New York, New York 10170Kanfer & Holtzer, LLPAttorney for DefendantBy: Alison Trainer, Esq.60 E. 42nd Street, Suite 1521New York, New York 10165

Jeffrey S. Sunshine, J.

FactsThe parties were married in New York on August 21, 2009 [NYSCEF #26]. The plaintiff-wife filed this action seeking a divorce exactly fifteen (15) years later on August 21, 2024. The plaintiff-wife is forty-eight (48) years old. The defendant-husband is fifty-one (51) years old. Two (2) children were born of the marriage: they are thirteen (13) [born July 2012] and eleven (11) years of age [born December 2014].
Plaintiff-wife, through prior counsel, commenced this action on August 21, 2024, by filing a summons and complaint with notice [NYSCEF #1] together with the Notice of [*2]Maintenance Guidelines [NYSCEF #4]. An answer was filed by defendant-husband, through counsel, on October 16, 2024 [NYSCEF #6]. Defendant-husband's counsel filed a request for a preliminary conference on February 6, 2025 [NYSCEF #7] and a preliminary conference was scheduled for March 19, 2025 [NYSCEF #10].
On consent, the parties stipulated to adjourn the preliminary conference from March 19, 2025 to April 10, 2025 [NYSCEF #12]; however, on April 8, 2025, plaintiff filed a consent to change attorney [NYSCEF #16] and incoming counsel filed a notice of appearance [NYSCEF #19] with a copy of their retainer agreement [NSYCEF #18]. The Court held the preliminary conference and issued the preliminary conference order on April 10, 2025 [NYSCEF #21].
On May 12, 2025, the parties executed a final Custody and Access Agreement for joint legal and 50/50 shared (equal time) residential custody of the children [NYSCEF #23].
The parties consented to and were screened for appropriateness and the Court issued an order of reference to the matrimonial mediation program on May 12, 2025 [NYSCEF #24].
On July 10, 2025, plaintiff filed an order to show cause [NYSCEF #25; motion seq. #1] seeking the following relief:
i. Directing that Defendant be ordered to pay 50% of the Children's add-on expenses, including, but not limited to, the Children's private school tuition, unreimbursed healthcare costs and extracurricular costs;[FN1]
ii. Directing that Defendant reimburse Plaintiff for any overpayment she has paid to the Children's private school from January 2025 to the issuance of a Decision on this application, whether such overpayments were for the 2024-2025 school year or for the 2025-2026 school year;[FN2]
iii. Compelling Defendant to produce forthwith all outstanding financial documents for the G.T.F. [REDACTED] Trust and the entities it owns, directly or indirectly, including, but not limited to, [REDACTED] LLC and [REDACTED] LLP, as requested in Plaintiff's First Notice for Discovery and Inspection dated May 15, 2025; andiv. Such other relief that the Court finds just and equitable.The plaintiff's order to show cause was supported by plaintiff's affirmation in support [NYSCEF #26] and plaintiff's counsel's affirmation in support [NYSCEF #27] together with exhibits [NSYCEF #28-61].
On July 21, 2025, the parties consented to adjourn the order to show cause to August 14, 2025, so that defendant could file a notice of cross motion together with opposition to the plaintiff's order to show cause [NYSCEF #68]. The stipulation of adjournment provided a full briefing schedule on consent and, with Court permission, the parties adjourned the depositions as scheduled during the preliminary conference order to August 14, 2025 based on the briefing schedule for the parties' cross applications.
Defendant counsel filed the notice of cross motion on July 28, 2025 [NYSCEF #70], seeking the following relief:
(i) awarding defendant child support pendente lite in the amount of $7,785.44 per month, retroactive to the date of this application;(ii) directing plaintiff to pay her pro rata share (93.43%) of the parties' children's add-on expenses pendente lite, retroactive to the date of this application, i.e., private school tuition, unreimbursed medical expenses, health insurance, extracurricular expenses, etc.;(iii) pursuant to DRL§237 awarding defendant $25,000 in pendente lite counsel fees without prejudice; and(iv) for such other and further relief as this Court deems just and equitable.Defendant's notice of cross motion was supported by defendant's affirmation in support [NYSCEF #71] and defendant's counsel's affirmation in support [NYSCEF #72] together with exhibits [NYSCEF #73-100].
Plaintiff filed an affirmation in reply [NYSCEF #101]; plaintiff's counsel filed an affirmation in reply [NYSCEF #102] with exhibits [NYSCEF #103-114]. Defendant filed a reply affirmation [NYSCEF #116]; defendant's counsel filed an affirmation in reply [NYSCEF #117] with exhibits [NSYCEF #118-123]. Plaintiff filed a memorandum of law [NYSCEF #133]. Defendant filed an amended memorandum of law on consent [NYSCEF #134]. The Court heard oral argument on October 22, 2025 [NYSCEF #136 (transcript of oral argument)].
The Parties' Positions

The parties agree that they grew up in vastly different socio-economic and educational circumstances: each party included extensive "background" representations about their respective childhoods and about their perceptions about the perceived shortcomings of the other, especially their respective opinions about the alleged shortcomings of the other's relationship toward money. Essentially, the wife alleges that the husband has a "casual" relationship to money and that he spends money on things she does not place as much value on because his childhood was financially secure and the husband alleges that the wife is hyper-fixated on obtaining money and living a lavish lifestyle at the expense of what he believes would be a "better" work-life balance.
The Mother's Position

The wife avers that she immigrated to the United States from China as a child and attended elementary, middle school and high school in the New York City Public School system before obtaining an undergraduate degree at a SUNY college and a MBA at a CUNY school. She attended a private law school but, she avers, she chose to attend a lower ranked law school because it offered her more scholarships and tuition assistance. She avers that she grew up in a:
. . . working-class immigrant family with no intergenerational wealth or financial safety net. My father was a high school math teacher in China but was not able to teach in the United States, and so became a cook in a Chinese takeout restaurant to support our family — he worked extremely long hours, and often seven days a week. My mother worked in a sewing factory in Chinatown six days a week, also for extremely long hours, and in troubling conditions. We barely had enough money to meet basic food, clothing and shelter necessities for our family [NYSCEF #26, p. 3].
It is undisputed that after graduating from law school, the wife practiced corporate law for ten (10) years before transitioning to a law firm management role in "crisis management and [*3]business continuity" [NYSCEF #26, p. 3]. She represents that she owes approximately $27,000.00 in student loans from law school because she paid for her educational expenses herself without family financial assistance while, she contends, the husband attended "the best and most exclusive private" schools in the Phoenix area before earning a bachelor's degree from a private liberal arts college and subsequently a MBA from The Wharton School of the University of Pennsylvania [NYSCEF #26, p. 4]. She contends that the husband's family paid for most of the husband's private educational expenses and that whatever Stafford Loans he had from his education at Wharton were paid off during the marriage [NYSCEF #26, p. 4].
The wife contends that the parties' "vast differences in background and family wealth have a significant impact on our respective approaches to education and other expenses for the Children" [NYSCEF #26. 5]. She avers that throughout the marriage the parties "roughly divided household expenses, including the Children's expenses, equally despite any income differences until January 2025 when Defendant unilaterally reduced his contribution to approximately 25%" [NYSCEF #26, p. 5]. The wife contends that the Court should order the parties to continue this alleged shared (50/50%) financial structure related to any child support award during the divorce notwithstanding the parties' current incomes and any statutory support calculations.
The husband contends that during the marriage he struggled to live up to the wife's financial expectations from the time he proposed to her alleging that the plaintiff was critical of the size of the engagement ring he offered and that during the marriage the wife made financial decisions that he believed prioritized "status and appearances" rather than what he believed would have been best for the family financially. He contends that the wife insisted on spending money on "upwardly mobile" financial appearances including that despite owning an apartment that the wife insisted that the parties purchased a 120-year old, 5-bedroom townhouse for more than $3,300,000.00 [NYSCEF #71, p.6-7]. The wife contends that this was a sound financial investment and points out that when the parties sold the marital residence recently they each received approximately $1.4 million in net proceeds. 
The husband contends that the wife demanded that he pay one half (50%) of all expenses during the marriage even though the "plaintiff has historically earned more than I have throughout our marriage" [NYSCEF #71, p. 12] and despite, he contends, the wife spending "excessively on fashion, furnishings, dining out, vacations, etc." [NYSCEF #71, p. 13]. He contends that the wife's spending only increased after his employment was terminated in 2021 but that she continued to demand that he contribute half (50%) of the expenses [NYSCEF #71, p. 13].
The husband contends that "plaintiff will not accept the reality of our financial situation, her dissatisfaction does not translate into imputing an income to me which is not based on fact or reality, and which is more than I have ever earned in non-severance annual wages throughout our marriage, or could ever expect to earn based upon my skillset and current employment history" [NYSCEF #101, p. 1-2].
The husband argues that:
. . . despite our historically unequal incomes, what plaintiff is unwilling to recognize is that while we were married and paying for these expenses equally with marital funds, at plaintiff's demand, we were using our earnings to pay for them until I lost my job from [REDACTED]. As plaintiff increased her spending, and the gap in our incomes widened, I had to draw down on savings to pay for expenses, while she was able to use her income stream to [*4]pay for these expenses, and leave her savings unscathed. I was therefore deficit spending, which, once plaintiff commenced the divorce action, was not only untenable but also inequitable, insofar as if I continued to do so, I would be left with nothing by having had to deplete my assets, while plaintiff would continue to amass more wealth from her assets in addition to her $700,000 stream of income, thus fulfilling her desire for marital reparations [NYSCEF #116, p. 9].
He argues that plaintiff's "current income—approximately $700,000—is 2.5 times the salary I last earned at my peak when I was employed in 2021 ($254,098). While plaintiff's bonus maybe "discretionary", it has always been so, and her income has continued to increase over the course of our marriage. There is no reason to believe plaintiff's income will not continue to do so" [NYSCEF #71, p. 13].
The husband contends that:
Despite the significant disparity in our incomes, as well as the fact that our incomes have not been generally equal since 2018, throughout our marriage plaintiff demanded I contribute equally to our expenses, which I tried to do, until plaintiff's spending spiraled out of control to the point where we had nearly doubled our spending. Since 2021, I had not been generating an income comparable to my historical earnings, and in some years none at all. While plaintiff continued to spend despite my protests, she was able to contribute to our marital expenses with her income stream while I was forced to deplete my separate accounts to sustain plaintiff's lavish lifestyle. I did so for the sake of appeasing plaintiff until I realized that our marriage was unsalvageable [NYSCEF #71, p. 14-15].He argues that:
. . . the payments I made towards our joint expenses are not reflective of what I could afford to do with my stream of income, either during our marriage or currently, and as such, should not be considered as a basis for imputing income to me, especially in light of our significant income disparity [NYSCEF #71, p. 15].
There appears to be no disagreement between the parties that during the marriage the wife insisted that the husband pay half (50%) of the family expenses even when they did not earn similar incomes. The husband contends that this placed an increasing financial strain on him to "keep up" financially as the wife's income steadily increased during the marriage but his income did not increase at the same pace. He asserts that he has not earned similar gross income to the wife in many years and that he has never earned anything like what the wife earns now.
The husband contends that even after he lost his employment in 2021 the wife continued to insist that he contribute financially equally for family expenses which caused him high level of anxiety. The wife contends that the husband continued to spend freely while he was unemployed. 
The Wife's Employment

It is undisputed that throughout the marriage the wife has worked at the same law firm. The husband contends that the wife worked long hours late into the night, including on weekends and during holidays/vacations trying to obtain a partnership position at the law firm where she works. The husband contends that the wife worked "relentlessly" at the law firm where she has been employed for more than twenty (20) years. He contends that for the wife "[b]eing [*5]promoted to partner and increasing her income, regardless of the physical and emotional toll it took on her were more important to plaintiff than our relationship and ultimately our family" [NYSCEF #71, pp. 4-5]. 
He asserts that "I supported plaintiff and often sacrificed my needs/desires given the time demands and unpredictable implications of her work schedule" [NYSCEF #71, p. 4]. He avers that during the marriage the "[p]laintiff was less interested in the day-to-day upbringing of our children - bedtime, reading, playing, homework (when they were older), doctor appointments, etc." and that after he lost his job in 2021 he became the " . . . de facto primary parent for our children, and our household manager, which plaintiff benefited from, as she was free to work long hours and to focus on increasing her income without having to care for our children or our household" [NYSCEF #71, p. 8]. The husband contends that because of his efforts "at home" the wife was able to maximize her efforts to build a lucrative career [NYSCEF # 71, p. 9]. 
The wife disputes the husband's rendition of the parties' respective child-care responsibilities during the marriage. She avers that:
I carried the lion's share of parenting responsibilities throughout our marriage, even while working full time in a demanding legal career. My frustration about the imbalance in responsibilities over the years became a recurring topic in couples' therapy. I was deeply involved in every aspect of our children's care, from managing their daily routines to organizing childcare, school participation, grocery shopping, preparing meals, organizing summer camps, managing cleaners, arranging doctor and dentist appointments, alongside additional household operations. Defendant did not begin contributing meaningfully to these tasks until 2022, after I made repeated demands that he take on more responsibility [NYSCEF #101, p. 6].
The Husband's Employment

The husband contends that during the marriage the parties agreed that because the wife's law firm employment was secure that he "could work for riskier tech startups" and that "while plaintiff has been at [law firm] for nearly 20 years, the median tenure for startup employees is approximately 2 years, and the tenure average for a Chief Product Officer ("CPO") is approximately 2.6 years" [NYSCEF #71, p. 5]. He details the consistent albeit numerous employment positions he held during the marriage [NSYCEF #71, p. 5-6]. He contends that his last employment as a "CPO" was in 2021 and that he did not leave his employment voluntarily but was let go with a severance package. 
It is undisputed that the husband lost his employment in his prior industry in 2021. The wife contends that the husband, in effect, did not try hard enough to find comparable employment in his career field from the time he lost his employment in 2021 until 2023 when he started a coaching business. She contends that the husband's pivot to consulting work after he was let go from his employment in 2021 was "in contemplation of divorce" and that whatever income he has earned over the last few years was dramatic under-earning to manipulate the financial outcome of any divorce litigation. She contends that the husband "intentionally transitioned in 2023 to a lower-paying career as a self-employed executive coach" after a long career throughout the marriage where he worked "as Chief Product Officer at three major organizations, and his skills and experience place him in the top tier of potential earners for his field" [NYSCEF #26, p. 5]. 
The wife contends that "any purported financial hardship Defendant now claims is the [*6]result of choices that he unilaterally made. Rather than pursue employment consistent with his experience and qualifications, he intentionally decided to enter a different, lower-paying field, notably while we were engaging marriage counselors and openly discussing divorce" [NYSCEF #101, p. 3].
The husband disputes that he has ever been "voluntarily unemployed" as claimed by the plaintiff. He avers that he made diligent and consistent efforts to find employment comparable to the employment he held during the marriage [NYSCEF #116, p. 2] but that he was unable to make it to the final rounds of any interview process [NYSCEF #116, p. 4]. He avers that:
I made a good faith effort to secure comparable employment as a chief product officer or lower title from April 2022 to September 2023, including applying for jobs, networking with everyone I knew in the industry, actively participating in 2 job search councils (weekly and biweekly) and reaching out to have 400 conversations with various companies, recruiters and individuals. After diligently searching for 1.5 years, I made a carefully considered decision to pivot to a new career, in which I thought I would be able to succeed based upon my skillset. Naturally, starting a new business is not done in a day, and it did take time. I did not, however, do anything to intentionally reduce or suppress my income [NYSCCEF #116, p. 4].The husband contends that he "looked for employment as a CPO, VPor Senior Director of Product for approximately 1.5 years, with more than 75 companies in total" [NYSCEF #71, p. 7]. The husband annexed an extensive job search log in support of his assertion that he has diligently sought employment [NYSCEF #74] and contends that "[d]espite these efforts, I was not receiving any job offers. It was stressful, depressing and utterly demoralizing" [NYSCEF #71, p. 7] and that "while risky", instead of remaining unemployed, he "began my new career as an executive coach" [NYSCEF #71, p. 8].
The husband contends that he only began building his coaching business after he exhausted his options for returning to work in his prior career path and finally decided that his best option for future employment is to "continue growing my business as an executive coach and consultant" which he contends he has been steadily doing for the last few years [NYSCEF #71, p. 10]. 
Vocational Experts

Both parties retained vocational experts related to the husband's employment prospects. The wife contends that the vocational expert she retained will testify that the husband's earning capacity is approximately $345,000, plus equity and benefits. The husband contends that the vocational expert he retained will testify that the husband's earning capacity at "expected initial earning capacity as an executive coach is $100,000 to $130,000 per year for the next five years, growing to $170,000 to $210,000 per year within approximately 5 to 7 years" [NYSCEF #71, p. 10]. The wife contends that the husband's vocational expert's report should be "disregarded" because it "refers to salary data in Kings County (Brooklyn, NY), rather than NYC/major metro benchmarks, which would be a more logical geographical target for an executive leader of Defendant's caliber" [NYSCEF #26, p. 11].
The issue of imputing income to the husband and the use of vocational experts is one for trial where the parties can call expert witnesses to testify subject to cross-examination. 
The Parties' Incomes 2019-2025

[*7]YEAR

The Wife

The Husband 

2019

$380,500.00 [FN3]

$284,414.54 [FN4]

2020

$421,366.25 [FN5]

$290,355.54 [FN6]

2021

$501,692.62 [FN7]

$534,555.35 [FN8]

2022

$539,999.92 [FN9]

$13,104.00 [FN10]

2023

$764,999.96 [FN11]

No income reported?

2024

$703,266.84 [FN12]

$51,000 [FN13]

2025

No income information in the record at this time

$92,000 [FN14]

The wife avers that from 2016 to 2021 the parties "made in total close to the same amount of income, with Defendant slightly outearning me" [NYSCEF #26, p. 11]. The wife [*8]contends that her total gross income of $703,266.84 in 2024 should not be considered because it includes annual bonus of approximately $300,000.00 which, she contends, she is not guaranteed to receive; however, the wife does not dispute that she consistently received an annual bonus each year. It appears from the exhibits annexed to the application that the wife's annual bonus has increased each year.. There is no allegation by either party as to any unreported or cash income for the years 2019-2025.
The wife contends that no award of pendente lite child support is appropriate in this case and that the Court should order the husband to pay half (50%) of the children's expenses, including private school. She avers that she is "spending more than I am taking home every month, and have been forced to spend down my savings" and she argues that "[i]t is completely unjust for me to be forced to shoulder the burden of the majority of the expenses Defendant and I had been sharing 50/50 until he unilaterally declared his reduced contribution in January 2025. The status quo add-on expenses for the Children, including extracurriculars, should revert to a 50/50 division [NYSCEF #26, p. 9].
She contends that if the Court does award child support that the Court should not consider her full income of $703,266.84 earned in 2024 because approximately $300,000.00 of it was a bonus and, she contends, the husband is "drastically underearning based upon his Wharton MBA education, past income and past job history. He is a highly educated and professionally accomplished man" [NYSCEF #26, p. 9]. The wife retained a vocational expert who issued a report [NYSCEF #40] that the husband "has an earning potential of approximately $345,000 in cash compensation per year plus benefits, which is in line with his prior three (3) jobs" [NYSCEF #26, p. 10].
The wife contends that the Court should impute "income of at least $345,000 per year should be imputed to him for purposes of calculating child support and determining financial obligations" [NYSCEF #101, p. 10]. She argues that the husband's lifestyle belies his income claims because he rented a three (3) bedroom apartment in a trendy Brooklyn neighborhood for $6,995.00 a month [NYSCEF #26, p. 21]. The wife's rental is $6,800.00 monthly. The wife contends that:
"[i]t is ironic to me that Defendant has a more spacious and more expensive rental than me given his contradictory assertion that he does not have the means to contribute equally to his Children's expenses, and his self-determined 25% pro rata share of the same, thereby shifting the financial burden and sacrifices to me" [NYSCEF #26, p. 21]. She contends that the "Defendant has committed to a significant lease obligation that he cannot afford based on his represented income alone" which, she argues, "suggests that Defendant either has the means or is relying on undisclosed financial resources" [NYSCEF #26, p. 22]. The husband contends that he rented an apartment that he felt would be comfortable for the children during parenting time with him since the children had already been disrupted from their 5-bedroom home when the parties sold the marital residence and moved into separate apartments.
Access to Financial Resources

The wife contends that the husband's net worth is "far greater than mine" [NYSCEF #101, p. 1] and that the husband's family financial resources "would certainly be made available to Defendant, should he or the Children ever be in need" and that the "Defendant has chosen to work in a significantly lower-paying an less demanding job, rather than earning income [*9]commensurate with his full earning capacity" [NYSCEF #101, p. 2]. The wife argues that " . . . it is clear that Defendant has significant assets and earning capacity and can afford half of the children's expenses and his own counsel fees, even without access to his Trust" [NYSCEF #101, p. 3]. She contends that "[d]efendant not only has millions in readily accessible liquid assets but also has access to family wealth through his trust" [NYSCEF #101, p. 10]. As such, she contends, she should have no obligation to pay any direct child support to the husband.
The wife argues that " . . . .I should not be required to pay child support to someone with his level of financial resources or earning capacity, nor should I be forced to subsidize his legal fees or his rent" [NYSCEF #101, p. 4]. She contends that:
Defendant should not be awarded child support as he cannot establish that he is the non-monied spouse when the totality of his financial circumstance is considered. Defendant is a highly educated and professionally accomplished individual who has intentionally reduced his income and is now using that deliberate choice to push the financial responsibilities of our children onto me. His deliberate decision to abandon a lucrative career in executive product management and instead pursue significantly lower-paid work as a self-employed executive coach is a voluntary choice. It does not justify shifting the burden of child support onto me. If anything, given his access to significant resources in the millions of dollars (the totality of which is not yet known), he may theoretically be obligated to pay me child support [NYSCEF #101, p. 8-9].The husband contends that even if the parties have similar financial assets that:
. . . plaintiff also has an income stream of $700,000, which is 660% more than my $92,000 forecasted for 2025. Our non-severance incomes have not been generally equal since 2017, over 7.5 years ago. In the 5 years between 2016 and my2021 job loss, my base and bonus had not materially increased, whereas plaintiff's had nearly doubled, and plaintiff's nearly tripled by 2023/2024. It is not equitable for me to have to deplete my assets, while she can save hers, by utilizing her income stream to pay for expenses in order to fulfill her desire for marital reparations [NYSCEF #116, p. 7].
Marital Lifestyle

The husband contends that the family enjoyed a "luxurious lifestyle" during the marriage [NYSCEF #116, p. 5] and that the family spending from "mid-2023 to mid-2024 ((prior to the date of commencement and using mid-2024 as that was when we first met with a mediator, REDACTED) was approximately $507,000 for that 1-year time period, including $59,225 in taxes" [NYSCEF #116, p. 6]. 
The husband criticizes the wife for, he alleges, insisting that they only use an expensive, luxury paint when the parties renovated the marital residence. The wife criticizes the husband for using Ubers to pick up that paint. It is clear from both parties' affirmations and Statements of Net Worth that the family lived an extremely comfortable lifestyle during the marriage.
The wife contends that "[d]efendant does not need anywhere near the $7,785 he seeks to support the children. Based on a six-month review of the Fidelity joint credit card ending in x5696 which Defendant uses almost exclusively for the children's expenses while they are in his care the average monthly cost for food and clothing is approximately $520" [NYSCEF #101, p. 12-13]. The husband contends that the wife insisted that the family live "on an austerity budget after the commencement of the divorce action" which he contends was a divorce litigation tactic "to make it appear as though our spending — excessive spending driven by plaintiff — was [*10]nowhere near as high as it was only weeks prior to her commencement of the divorce action" [NYSCEF #116, p. 5].
Disclosure Related To "The Trust"

There is no factual dispute between the parties that defendant is named on a trust ["The Trust"] through his family. The wife contends that the husband has access to multi millions of dollars through the Trust. The husband contends that he is, in effect, listed on the Trust for convenience and estate planning purposes, that any interest he has is revocable and that his actual access to funds in the Trust is limited to approximately two hundred ($200.00) dollars. He denies that he has access or control over the millions of dollars by way of the Trust as alleged by the wife.
The wife avers in her affirmation in support "[t]here are still many questions of fact remaining on the true value of the Trust and Defendant's access and control of such funds" because, she alleges, the defendant has not provided meaningful disclosure related to The Trust [NYSCEF #26, p. 14]. [NYSCEF #26, p. 14]. She contends that, based on the limited statements the husband provided, that "[t]he appreciation of Defendant's Trust value in only two (2) months (July and August) in 2024 of $463,823.72 is greater than my [the wife's] entire base salary for the calendar year 2024" [NYSCEF #26, p. 15]. The wife contends that without full disclosure related to "The Trust" that she cannot engage in financial settlement because the defendant has made many divergent claims related to the value of "The Trust" since 2012 including that:
On July 17, 2012, Defendant responded to a personal planning questionnaire from our trust and estate attorney, listing the value of the Trust as $1,500,000 (annexed hereto as Exhibit V). On June 25, 2013, in a cooperative apartment application for the purchase of our first marital residence at [REDACTED] in Brooklyn, NY, Defendant stated that the Trust was valued at approximately $914,000 (annexed hereto as Exhibit W). On September 11, 2024, Defendant emailed me his 2023 K-1 issued by [REDACTED] LLC to the Trust reflecting an ending capital account of $2,593,909 (annexed hereto as Exhibit X7). Specifically in this action, Defendant's sworn representations in both his Statement of Net Worth dated November 15, 2024 (not filed but exchanged) and his Amended Statement of Net Worth dated March 31, 2025, were that the Trust was worth $206.17 as of the date of commencement (annexed hereto as Exhibit Y and Exhibit Z) [NYSCEF #26, p. 16].The wife asserts that the husband must provide full disclosure because "The Trust is relevant for its bearing on any claims for support and the Children's expenses" [NYSCEF #26, p. 18]. She contends that "The Trust" was on our joint tax returns throughout our marriage" and that full disclosure " . . . is the only way the Court and I can get an accurate picture of Defendant's finances and assets" [NYSCEF #26, p. 19].
The husband contends that the Trust documents that the wife wants are not under his possession, custody and control and that his mother, as Trustee, is the member who has control over The Trust. He avers that the parties:
. . . never used Trust money to pay for private school during our marriage, let alone any other expense, as we have never received distributions from the Trust during our marriage [NYSCEF #71, p. 19].
The husband concedes that during the marriage the parties:
. . . provided the information most suited to the context in response to queries seeking different information for different purposes. One form we completed with our T&E attorney to determine potential exposure to estate tax limits, on which I answered as though it was an estimate of a potential future inheritance, which I could only guess because I had never been given the information. Another was for a co-op application where we were trying to optically increase the value of our assets to win an apartment bidding war. I never claimed to have access to any funds other than what is in the Trust (now $206). [NYSCEF #71, p. 22].
The wife contends that "[i]t is not credible for Defendant to now claim that these assets are unavailable for supporting his children" when he does not deny that he relied on the Trust to strengthen his financial appearance at other times during the marriage "depending on whether it serves his financial interest" [NYSCEF #101, p. 11]. She contends that "[i]n making any determination of support and counsel fees, the Court should take into account the longstanding pattern in which Defendant and his family treat the Trust as Defendant's personal asset" [NYSCEF #101, p. 12].
The husband avers that:
I have not received any distributions from the Trust during our marriage . . . [NYSCEF #71, p. 20].After oral argument on the record on October 22, 2025, the Court ordered the defendant to provide "full disclosure of this trust". While the wife's application for that the husband be required to provide discovery related to the Trust was granted, the wife's application for the Court to, in effect, impute income to the husband for the purposes of awarding pendente lite support based upon the theory that the husband has access and control of any funds in The Trust is premature based upon the wife's own assertion that there are still many outstanding questions related to the value of the Trust and the nature of the husband's ability — if any — to access the Trust. Any imputation of income from The Trust to the husband is not ripe for adjudication based upon the wife's own admission that there has been insufficient discovery. In her affirmation, the wife concedes that based on the discovery available at this time "I cannot feel confident about entering into financial settlement negotiations with Defendant" [NYSCEF #26, p. 15-16]. Similarly, there is insufficient information before this Court, at this time, to consider the wife's allegations related to the Trust in any award of pendente lite support. The Court has ordered the husband to provide full discovery related to The Trust and the wife will have a full opportunity at trial to establish the basis to impute income to the husband based on The Trust if such a basis exists and any award of final support would be retroactive to the date of first application so there is no prejudice to the wife.
Furthermore, while certainly a basis for the wife to seek discovery of the Trust, it is premature at this time to assert that because both parties concede that they listed The Trust on various tax documents and financing application to obtain advantageous outcomes during the marriage that the husband has full access to the Trust. Addition, here, there is no allegation by the wife that the husband drew from the Trust or received direct financial support from the Trust during the marriage to pay for ongoing family expenses and the husband avers that he never received funds from the Trust during the marriage, rather, the wife's argument is that the husband may have access to these funds — whatever they may be — in the future or may be able to elect to invade the Trust now but is choosing not to do so. Lastly, the wife concedes that she does not [*11]know how much money is in the Trust.
At this point, the direct financial support the wife alleges came from the husband's family during the marriage is her claim that the husband's parents covered travel related expenses for the family to visit them in Arizona. The wife contends that on these trips the husband and the children "typically stay at his parents' home, borrow their car for transportation, and participate in activities that are fully subsidized by the grandparents" [NYSCEF #101, p. 13]. The wife may explore these alleged financial benefits at trial if appropriate but pendente lite the Court will not find that grandparents allowing their child to borrow a family car to transport grandchildren during family vacations is a basis to impute income under the facts and circumstances presented. 
The wife herself asserts that she does not know what the financial records of the Trust will show because there has been insufficient discovery. Certainly, if the wife concedes that there is insufficient documentation at this point there is also not enough documentation for the Court to adjudicate that issue pendente lite. 
The wife raised sufficient allegations related to the husband's connection to the Trust — including her allegation that the parties used the Trust on certain applications to improve their financial appearance — and based upon those allegations the Court, after oral argument, granted her request that the husband provide full financial discovery related to the Trust. The husband contends that any benefit from listing the Trust on financial applications during the marriage inured to the wife's financial benefit as much as it did to his own because it allowed the parties to pursue real estate purchases that they may not have been able to otherwise even if he never actually had access to the money in the Trust. Once discovery related to the Trust is complete, the parties will be able to pursue support claims based upon all relevant financial documentation: that is a question for trial.
The wife too will have an opportunity at trial to prove her case related to her allegations about the husband's access and control over the Trust if appropriate after discovery is complete and, if successful, that may be a relevant factor in any final determination of support which may also be retroactive to the first application; however, to award pendente lite support based on her allegation under these facts and circumstances where even she contends that she does not have enough information would be inappropriate.
The Plaintiff's Statement of Net Worth, dated November 14, 2024 [NYSCEF #14]

The plaintiff listed the following expenses:
Mortgage, $9,827.68 [FN15]; homeowner's insurance, $191.64; gas, $80; electric, $381; mobile phone, $160; internet, $50; alarm, $8.70; water, $67; groceries, $1,075; dining out, $1,000; alcohol, $134; clothing (self), $833; clothing (children) $65; dry cleaning, $30; life insurance, $98; automotive insurance, $110.67; umbrella policy, $132; medical plan insurance, $1,846; dental insurance plan, $192.75; optical insurance plan, $22.33; unreimbursed medical (self), $19; unreimbursed dental (self), $53; unreimbursed dental (children), $31; unreimbursed optical (self) $8; unreimbursed optical (children), $14; unreimbursed pharmaceutical (self) $13; unreimbursed pharmaceutical (children) $30; household repairs $250; domestic housekeeper $400; automotive gas $27; automotive repairs $70; car wash $3.30; parking/tolls $22; private school tuition $9,962; school [*12]transportation $41.67; school supplies $23; children's extracurricular activities $226; Netflix $25; Spotify $9.74; activities for self $22; summer camp $1,041; birthday parties for children $100; beauty parlor $120; toiletries (self) $51; toiletries (children) $53; books $20; gifts to others $83; charitable contributions $70; commutation expenses $430; loan payments (student loan) $240.
TOTAL MONTHLY EXPENSES: $29,762.48The wife's Statement of Net Worth lists the following assets: checking accounts totaling $30,515.91; savings accounts totaling $109,930.14; real estate [FN16]
; retirement accounts totaling more than $1,355,707.09; a 2017 Lexus (subject to appraisal); jewelry of unknown value; household furniture of unknown value; investment accounts of $445,176.53. In total, the wife represents assets totaling "unknown" [NYSCEF #14]. She lists liabilities of a law school loan of $28,768; no credit card debt; a mortgage [FN17]
; installment plan payments for the children's private school tuition of $78,896.32.
The Defendant's Statement of Net Worth, dated August 2025[NYSCEF #126]

The defendant listed the following expenses:
renter's insurance, $17; rent, $6,995; fuel, $40; electric, $202; mobile phone, $54; internet $75; groceries, $623; dining out $734; clothing (self) $40; clothing (children) $109; life insurance $98; automotive insurance $118; umbrella policy $47; medical plan (paid through wife's employer) $1,846 [total expense]; dental plan (paid through wife's employer) $193 [total expense]; optical plan (paid through wife's employer) $22 [total expense]; unreimbursed medical $162; unreimbursed dental $303; unreimbursed optical $105; unreimbursed pharmaceutical $38; unreimbursed psychotherapy $175; housekeeper $347; automotive Gas $14; automotive repairs $24; car wash $8; parking/tolls $9; car registration $13; rideshare/subway $387; private school $10,450; school supplies $14; children's extracurriculars $72; computer/electronics $97; vacations $997; movies $76; summer camp $1,020; shopping $160; retail/general $50; Venmo $120; ATM Cash $278; unclassified $439:TOTAL MONTHLY EXPENSES: $26,583The husband's Statement of Net Worth lists accounts in his name, in the wife's name and in joint names. The husband lists the following assets: checking accounts totaling $65,698; savings accounts totaling $1,158,769; retirement accounts totaling more than $2,077,000; a 2017 Lexus (subject to appraisal); new furniture and home décor valued at more approximately $100,000; a necklace valued at $9,146; securities (in husband's name) of more than $986,000; contingent interest (Trust) $206; bonds (claimed separate property) more than $62,000; various UTMA accounts for the children of approximately $119,000. In total, the husband represents assets (including all marital assets and children's account) of approximately $4,418,000.00. He lists liabilities shared by the parties of $36,241 on various credit cards most of which appears to [*13]be related to the parties each charging retainers for their respective attorneys. The husband also lists an instalment account due to the private school the children attend in the sum of approximately $125,000 and a student loan in the wife's name with an "unknown" balance.
Child Support Standards Act

The Appellate Division, Second Department in Gonzalez-Furtago v Furtado, 221 AD3d 975, 977 [2 Dept.,2023] detailed the well-established case law that:
"Any perceived inequity in the award of pendente lite child support can best be remedied by a speedy trial, at which the parties' financial circumstances can be fully explored (see Safir v. Safir, 206 AD3d at 844, 170 N.Y.S.3d 189; Swickle v. Swickle, 47 AD3d 704, 850 N.Y.S.2d 487).Neither party requested an award of maintenance. The Court finds that pendente lite no imputation of income is appropriate to either party. For the purposes of pendente lite support only, the husband's representations related to his attempts to gain employment in his prior career path prior to his decision to pivot to consulting work is supported at this time by documentation he submitted related to his ongoing employment search, including his job search log of more than seventy (70) applications; however, any application related to imputed income is reserved to trial where the parties can testify and cross-examine that testimony and present any relevant expert witness testimony. This pendente lite determination does not preclude the wife from pursuing any appropriate claims related to imputation of income to the husband at time of trial once discovery related to the Trust is complete nor does it preclude the Court from finding after trial that imputation of income to the husband is appropriate if the wife proves that he decreased his income in anticipation of divorce and/or remains under-employed to avoid support obligations. If the wife proves her case related to these allegations at trial the Court can award final support based upon that imputation of income retroactive to the date of first application. The Court finds at this time and under these facts and circumstances that imputing income to the husband based on his earnings several years ago is premature.
In reaching this determination pendente lite, the Court notes that after pivoting to his consulting business the husband asserts that his income has increased each year and that he expects it to continue increasing as he builds his business.
The wife's 2024 W-2 shows gross income of $703,532.84 that she paid FICA taxes in the amount of $24,423.92 ($10,453.20 for social security and $13,970.72 for Medicare) and NYC local income tax in the amount of $26,896.00. As such, the Court will deduct those payments as follows: $703,532.84 less $51,319.92 (FICA and NYC local taxes) equals $652,212.92.
The husband's 2024 income was $51,000.00; however, he acknowledged that he is building his new career and conceded that his 2025 income would be at least $92,000.00. The husband contends that while his consulting business is just starting that it is growing steadily. Based on the husband's conceded income at this time, the Court will utilize the income he conceded of $92,000.00 for the purposes of calculating pendente lite child support payable from the wife to the husband based on the presumptively correct Child Support Standard Act calculation using the parties' 2024 incomes. The husband did not provide any proof of payment of FICA or NYC local income taxes. 
The Court also rejects the wife's contention that the Court should, in effect, total the parties' respective income earnings from the last nineteen (19) years — including years before the parties even married — and determine their respective child support obligations pendente lite [*14]based upon an annualization of those incomes over time which, she contends, result in approximately the same income when considered overall. The wife's contention that a tally of the income earned by the parties since they met shows that over all that time they have earned similar total income. She insists that based on that long "look back" that the Court should find that the parties should be equally financially responsible for the children notwithstanding the current incomes of the parties: that proposition is not consistent with the Child Support Standards Act (CSSA). 
"The [Child Support Standards Act] CSSA sets forth a formula for calculating child support by applying a designated statutory percentage, based upon the number of children to be supported, to combined parental income up to a particular ceiling" (see Monaco v Monaco, 214 AD3d 659, 661 [2d Dept 2023]). The formula consists of a "three-step process which includes (1) computing a combined parental income, (2) multiplying that income, up to a certain income cap, by a specific percentage, and (3) determining the amount of income that should be considered for child support purposes if the combined parental income exceeds the income cap" (see Boltz v Boltz, 178 AD3d 656, 658 [2d Dept 2019])
Pursuant to the terms of the parties' stipulation of custody and parenting time, the parties share equal parenting time on a true 50/50 time split; however, for the purposes of pendente lite support that the wife is the monied spouse. As such, the husband is the "de facto" custodial parent for the purpose of pendente lite child support (see Safir v Safir, 206 AD3d 842, 843 [2d Dept 2022]). Therefore, the wife is obligated to pay pendente lite child support to husband for the parties' two (2) children.
The child support obligation in accordance with the CSSA for two (2) children is 25% of the combined parental income [see [DRL 240(1-b)(b)(3)] up to the $193,000.00 cap [SSL 111-1(2)(b)].
Utilizing the adjusted gross income amounts previously determined herein, the plaintiff-wife's 2024 income for the purposes of calculating pendente lite child support is $652,212.92 and the plaintiff's 2025 income is $92,000.00. As such, the combined parental income for the purposes of calculating child support pendente lite would be $744,212.92 ($652,212.92 [plaintiff-wife's income] + $92,000.00 [defendant-wife's income] = $744,212.92), which is above the statutory cap of $193,000.00.
Calculating child support on combined parental income up to and including the current statutory guideline cap of $193,000.00,[FN18]
the total annual child support obligation would be $48,250.00 ($193,000.00 x .25 = $48,250.00) or $4,020.82 (monthly), subject to reallocation after trial.
The plaintiff's pro rata share = 87.64% or $42,285.31 annually ($3,523.78 monthly; $813.18 weekly) and the defendant's pro rata share = 12.36% or $5,964.69 annually ($497.06 monthly; $114.71 weekly).
As such, the plaintiff shall pay to the defendant the sum of $3,523.78 monthly as and for basic pendente lite child support. The Court finds that pendente lite this sum is reasonable under the totality of the facts and circumstances and that it is not unjust or inappropriate warranting a deviation above the cap or a downward deviation at this time (see DRL 240[1-b][f]). Commencing on the 15th day of March, 2026 and continuing on the 15th day of each month. 
Here, in effect, both parties argued at different times that the other party insisted on a frugal lifestyle other than for the private school tuition. Neither party argued that the children had any other extraordinary financial needs or that the family enjoyed an extravagant lifestyle. In calculating pendente lite child support, the Court is not bound by the husband's unilateral decision while this litigation was ongoing to incur a voluntary rental apartment expense of almost $7,000.00 a month. As such, pendente lite, the Court will not award child support above the cap of $193,000.00. In doing so, the Court notes that the parties are — currently — paying for private school tuition for both children.
The "proper remedy for any perceived inequality in a pendente lite award is a speedy trial" (Silla v Silla, 228 AD3d 969, 971 [2 Dept.,2024]). The Court herein will set a pre-trial conference for selection of trial dates on the financial issues between the parties where the parties will be able to provide sworn testimony and offer evidence subject to cross-examination and any objections and the Court can make rulings and credibility findings. 
The Court notes that an award of child support is effective as of the date of application (see Domestic Relations Law § 236 [B][6][a]; see also Elimelech v. Elimelech, 58 AD3d 672, 874 N.Y.S.2d 490 [2 Dept., 2009]; Evans v. Evans, 57 AD3d 718, 870 N.Y.S.2d 394 [2 Dept., 2008]. The father's pendente lite application was July 28, 2025. As such, the sum of retroactive pendente lite child support due to the defendant is $24,395.40 ($813.18 weekly x 30 weeks = $24,395.40 retroactive pendente lite child support) with a credit for any direct child support payments made by check or other negotiable instrument, since July 28, 2025, the date of defendant's application for pendente lite relief (see Domestic Relations Law § 236 [B][6][a]); see also Mosso v. Mosso, 84 AD3d 757, 924 N.Y.S.2d 394 [2 Dept.,2011]). Here, the wife did not allege that she has paid any direct child support to the father.
These arrears shall be paid by the wife together with her monthly basic child support payment to the husband at the rate of $1,500.00 monthly until paid in full. Application for arrears retroactive to the date of commencement is referred to the trial court to make a final award of retroactive child support after the financial trial subject to testimony and evidence at trial particularly where there are such inconsistent allegations as to defendant's income (see Domestic Relations Law § 236 [B][6][a]).
Statutory Add-Ons

The Court finds that pendente lite any statutory add-ons (DRL 240[1-b][c][4]) shall be as follows: plaintiff-mother, 87.64%; the defendant-father, 12.36%.
Public School v. Private School

There is no dispute of fact between the parties that their two (2) children attend a private school in Brooklyn and that the combined tuition is approximately $126,000.00 per school year ($62,700.00/per child, per school year; or $10,450.00/month per child). The children have attended this private school since pre-kindergarten. The wife contends that at the time the parties agreed to enroll the children in private school the husband earned more than she did but that the parties financially shared the private school expense from 2016 through 2024 but that in January 2025 the husband unilaterally decreased his financial contribution for the private school tuition from 50% to 25%. 
The wife contends that:
. . . [i]t is Defendant's continued position that our Children should attend private school through high school, though he now refuses to pay 50%, as described more fully below. In contrast, I would prefer that the Children enroll in good quality public schools, as it is not [*15]feasible for me to fund the bulk of such expenses as Defendant demands [NYSCEF #26, p. 6].
The wife contends that:
. . . When it came time to enroll our oldest son in school in 2016, Defendant passionately advocated for private school, as he believed it was essential for the Children's academic and personal development. In contrast, I pushed for public school, as New York City has exceptional options, especially in Park Slope where we specifically moved for the excellent school zone. My own life has been a testament to what an ambitious student can achieve with a New York City public school education, and I was concerned by the ongoing, long-term cost of private school [NYSCEF #26, p. 5-6].
She contends that because the husband decreased his contribution to the private school tuition that she "made payments so as not to disrupt the Children's lives" but that she "cannot continue as I am spending down savings and we must return to the status quo if the Children are to remain in private school" [NYSCEF #26, p. 7].
The wife contends that:
Defendant insists on maintaining the most expensive aspect of our children's lives (private school), while disclaiming the financial responsibility that goes with it. He continues to advocate for the children to remain enrolled at REDACTED, one of the most expensive private schools in Brooklyn, yet claims he is functionally unemployable. He cannot have it both ways. If he is truly unable to contribute financially at least 50%, then he should not be able to unilaterally dictate high-cost educational decisions that have a significant negative impact on my finances [NYSCEF #101, p. 8].The wife argues that if the husband will not agree to continue paying half (50%) of the private school tuition that the parties should remove the children from the private school they have attended since kindergarten and that they should be enrolled in public school which, she points out, is where she went to school. The husband does not consent to moving the children to public school: he contends that it is important for the children to remain in the private school environment they have attended their whole life particularly where the parties are going through a contentious divorce. He contends that the children's lives have been disrupted by this divorce litigation and have already had to move out of the marital residence so he believes that maintaining the children's school environment is best for them.
Based upon the parties' inability to reach an agreement on whether the children should continue to enroll in private school, the Court appointed Cheryl Charles-Duval, Esq. as the attorney for the children by order dated November 3, 2025 [NYSCEF #135]. 
On the record on October 22, 2025, the Court referred the limited issue of final decision making related to education to an evidentiary hearing. The hearing on that limited issue is scheduled to begin on March 11, 2026 [NYSCEF #136]. 
It is undisputed that during the marriage the parties shared (50/50%) the cost of the children's private school tuition. To ensure that there was no interruption in enrollment pending the final determination, on the record on October 22, 2025, the Court directed that the parties continue to share (50/50%) the cost of any private school tuition subject to reallocation if appropriate after the Court makes a final determination after trial as to the financial issues. 
THE COURT: . . . I order the parties to pay one half of the tuition for the up-coming year subject to reallocation at the time of trial based upon the testimony at trial and based [*16]upon the Court's ultimate determination [NYSCEF #136, p. 31].As detailed herein, any reallocation of the pro rata financial obligation for private school tuition to either party requires that discovery on the Trust be completed and the Court make a final determination at trial as to the parties' incomes and access to financial resources.
Health Insurance

The wife contends that "[s]ince October 2021, following Defendant's loss of employment, I have had no choice but to assume full financial responsibility for the family's healthcare coverage through my employer. As of 2025, I pay the entirety of the premiums for both medical and dental insurance, which provide coverage for me, Defendant and the Children" [NYSCEF #26, p. 7]. She avers that for 2025, the husband's 50% portion of the cost of the insurance expenses should total $1,065.29 per month ($1,934.01 [monthly medical] plus $196.58 [monthly dental] = $2,130.58 divided by 2 = $1,065.29), plus 50% of any of the Children's uncovered healthcare expenses.
The wife shall provide the husband with proof of the monthly medical coverage costs for the parties' children within twenty (20) days and the father shall provide the mother with his pro rata share of the retroactive sum to the date of the pendente lite application within ten (10) days of receipt of proof. The portion of the health insurance cost that will be attributable to the children pendente lite shall be the difference between the cost of individual coverage for the plaintiff-mother and the cost to cover the two (2) children. The husband shall pay his pro rata share of the health care cost each month to the wife.
The parties shall exchange monthly accountings of any reasonable, unreimbursed medical costs on the 15th day of each month. Both parties shall have the opportunity to provide accountings of health care expenses incurred for the children using plan physicians where available retroactive to the date of commencement at the time of trial for allocation between the parties once the final pro rata is established. 
Counsel Fees

The husband contends that the wife is the monied spouse and he seeks an award of $25,000.00 in interim counsel fees. The husband paid a $15,000.00 retainer to his counsel and had at the time of filing his application "paid my attorneys a total of $47,742.39 [NYSCEF #71, p. 22]. He annexed copies of his Statement of Net Worth with retainer agreement attached [NYSCEF #99] and copies of his counsel fee billing records [NYSCEF #100]. The husband's counsel is billing at a rate of $400.00 to $500.00 an hour depending on which attorney is working on the case.
The wife maintains that if the husband has similar or more financial assets to what she has at this time and, she contends, if she proves at trial that he has access to the Trust then he may have access to far greater financial resources than she may ever have access to. The wife asserts that the husband should pay his own counsel fees noting that each party received approximately $1.4 million dollars in net proceeds from the sale of the marital residence during this litigation. Even if the wife is correct that the parties appear to have similar access to financial assets at this time (notwithstanding the allegations related to the Trust), the wife earns vastly more annual income than the husband at this time and disparity in income is a financial circumstance that the Court must consider. The "court must consider the financial circumstances of the parties and the circumstances of the case as a whole, including the relative merits of the parties' positions and whether either party has delayed the proceedings or engaged in unnecessary litigation" (Blocker v. Blocker, 221 AD3d 768, 769 [2 Dept.,2023]. It is well-[*17]established than an "award of interim counsel fees 'is designed to redress the economic disparity between the monied spouse and the non-monied spouse . . . to see to it that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet'" (Hutchinson v Hutchinson, 219 AD3d 1320, 1322 [2 Dept.,2023], quoting Prichep v Prichep, 52 AD3d 61, 65 [2 Dept.,2008]). Here, to deny the husband an award of pendente lite counsel fees would not redress the economic disparity between them given the vast disparity in their incomes at this time notwithstanding that both parties have access to liquid assets including savings from the sale of the marital residence. The wife's position that the husband to pay pendente lite any counsel fees from his share of the sale proceeds of that marital asset is not supported by the case law and is denied at this time. It is well-established that indigency is not required for an award of pendente lite counsel fees nor is a party to a divorce action required to deplete or exhaust his or her capital resources to qualify for a pendente lite award where there is a disparity in income (see DRL 237; see Susskind v Susskind, 18 AD3d 536 [2 Dept.,2005]; see also Mitzner v Mitzner, 228 AD2d 483 [2 Dept.,1996]).
The wife contention that the husband could be earning more income is also unavailing for the purposes of awarding pendente lite counsel fees under the facts and circumstances as detailed herein. As detailed hereinabove, the wife's allegations related to imputation of income and the Trust are subject to discovery but are not ripe for the Court to adjudicate at this time and, as such, would be inappropriate for the Court to consider in a pendente lite award of counsel fees. At this time, based on a review of the parties' W-2 incomes going back even several years, the wife is the monied spouse for the purposes of awarding counsel fees.
The Court has previously noted on the record that the parties are engaging in very extensive, expensive litigation and that the counsel fees incurred must be considered as the parties chose how to engage in the litigation.
At oral argument, plaintiff's counsel represented on the record that plaintiff had paid approximately $80,000.00 in counsel fees so far in this litigation: $20,000.00 to prior counsel and $60,000.00 to current counsel. Plaintiff's counsel affirms that she is charging plaintiff $700.00 an hour in this litigation. Defendant's counsel represented on the record that defendant had paid her firm $50,000.00 from his savings. Defendant's counsel affirms that she is charging defendant $400.00 an hour in this litigation. [NYSCEF #136].
The Court notes that both parties, at this time, are intrenched in positions that appear more grounded in their animosity to one another than in working toward resolving this case either by way of stipulation or by finalizing discovery and moving toward a final resolution after trial. Both parties' supporting affidavits were full of personal details relating to the parties' past and even included perceived slights that happened before the parties married. The parties have already spent more than $100,000.00 on this litigation and it appears that they are choosing to use this litigation — and paying their attorneys — in part to rehash details of their personal life rather than move this matter towards resolution.
The Court finds that under the facts and circumstances present here, including the nature and complexity of the issues raised, the qualifications of the husband's counsel, the length of time already spent by parties litigating the issues, and the fact that the wife has been found pendente lite to be the monied spouse as contemplated by Domestic Relations Law §237(a), that an award of pendente lite counsel fees in the amount of $20,000.00 to be paid by the wife to the husband's counsel is appropriate without prejudice to future applications for additional counsel fees, as necessary at the time of trial or sooner, upon the requisite showing (see DRL § 237; [*18]Prichep v. Prichep, 52 AD3d 61, 858 N.Y.S.2d 667 [2nd Dept.2008]; Kesten v. Kesten, 234 AD2d 427, 650 N.Y.S.2d 807 [2nd Dept.1996]; Dodson, 46 AD3d at 305; Jorgensen v. Jorgensen, 86 AD2d 861, 861, 447 N.Y.S.2d 318 [2 Dept.,1982]). While both parties have access to liquid assets, the wife's income at this time is nearly seven times (7x) that of the husband's income for the purposes of a pendente lite award. It is well-established that a party need not deplete their assets to fund a matrimonial action
The payment in this award of pendente lite counsel fees of $20,000.00 shall be made directly from the wife to the husband's counsel within thirty (30) days of service of notice of entry of this decision and order. If the wife fails to make the payment in compliance with this decision and order the husband's attorney may enter a judgment for the full amount then due and owing, plus statutory costs and interest, retroactive to the date of the default, with the Office of the County Clerk upon ten (10) days written notice by overnight and regular mail to the plaintiff and without further application to this Court.
Conclusion

Plaintiff's order to show cause [motion sequence #1] is granted to the extent.
Defendant's cross-motion [motion sequence #2] is granted to the extent.
This shall constitute the decision and order of the Court.
E N T E R:HON. JEFFREY S. SUNSHINE,J.S.C

Footnotes

Footnote 1:This issue was referred to the trial court on the record by the Court after oral argument on the record on October 22, 2025. The Court also directed the parties to pay the children's 2025-2026 private school tuition 50/50% subject to reallocation after trial.

Footnote 2:This issue was referred to the trial court on the record by the Court after oral argument on the record on October 22, 2025.

Footnote 3:The wife's 2019 W-2 [NYSCEF #82].

Footnote 4:The husband's 2019 W-2 [NYSCEF #82].

Footnote 5:The wife's 2020 W-2 [NYSCEF #82].

Footnote 6:The husband received two (2) W-2s in 2020 totaling $290,355.54 [NYSCEF #82].

Footnote 7:The wife's 2021 W-2 [NYSCEF #82].

Footnote 8:The husband's 2021 W-2 [NYSCEF #82]. The husband contends that this represented both income and a severance package and did not represent gross earned income from employment.

Footnote 9:The wife's 2022 W-2 [NYSCEF #82].

Footnote 10:The husband's 2022 1099-G for unemployment benefits [NYSCEF #82].

Footnote 11:The wife's 2023 W-2 [NYSCEF #82].

Footnote 12:The wife's 2024 W-2 [NYSCEF #82].

Footnote 13:The husband asserted that because he was just starting his business his gross income was "approximately $51,000" (not including business expenses). [NYSCEF #79]. A copy of what the husband contends were the parties' 2024 draft income tax returns.

Footnote 14:The husband avers that "I expect to earn approximately $92,000 (gross)" in 2025 [NYSCEF #71, p. 8].

Footnote 15:The Court notes that it is undisputed that the parties sold the marital residence and that the plaintiff is no renting an apartment. NYSCEF #89 reports her monthly rent as $6,800.00.

Footnote 16:The Court notes that the marital residence was sold and the proceeds divided between the parties.

Footnote 17:The marital residence has been sold so there is no more mortgage.

Footnote 18:Effective March 1, 2026.